NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0285n.06

Case No. 21-3980

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 15, 2022
DEBORAH S. HUNT, Clerk

FRED W. HOLLAND, M.D.

    Plaintiff - Appellant,

v.

MERCY HEALTH; MERCY HEALTH –
ST. VINCENT,

    Defendants - Appellees.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

Before: GIBBONS, WHITE, and NALBANDIAN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Fred W. Holland, M.D., appeals the district court's grant of summary judgment in favor of Mercy Health – St. Vincent's Medical Center ("St. Vincent"), one of his two former joint employers. Dr. Holland asserted national origin and race discrimination claims under Title VII, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981, as well as state-law claims against St. Vincent. Holland, a cardiothoracic surgeon, alleged that St. Vincent's then-Senior Vice President and Chief Physician Executive Officer, Dr. Imran Andrabi, and its then-Medical Director of Cardiothoracic Surgery, Dr. Fayyaz Hashmi, who are both of Pakistani origin, discriminated against him because he is an American-born Caucasian. We affirm the district court's grant of summary judgment.

**I**

The Toledo Clinic ("TC") and St. Vincent jointly employed Holland as a cardiothoracic surgeon operating from St. Vincent's facilities.[1] Before hiring Holland, TC did not have any cardiothoracic surgeons on staff and believed that adding one to whom its cardiologists could refer patients would be economically advantageous. At the same time, St. Vincent's cardiothoracic surgery department had an opening for a third surgeon. To serve these mutual interests, St. Vincent and TC signed a Services Agreement in December 2012 to create an employment structure for a new surgeon.

The Services Agreement provided that TC would hire a cardiothoracic surgeon and assign him to perform his work at St. Vincent and that St. Vincent would provide the facilities, equipment, and personnel for the surgeon. St. Vincent and TC agreed that St. Vincent would pay TC a set yearly rate for five years to compensate for the surgeon's salary, benefits, and other related expenses; TC would, in turn, pay the surgeon. The Services Agreement had a term of five years, "unless terminated sooner." DE 129-51, Services Agreement, Page ID 13000. Either St. Vincent or TC could terminate the Services Agreement after one year without cause by giving the other party ninety days prior written notice. St. Vincent and TC worked together to recruit a surgeon to serve their agreement and hired Holland in January 2013. Holland and TC entered into an Employment Agreement. Unlike the Services Agreement between St. Vincent and TC, the Employment Agreement did not have any specific end date; instead, either party could terminate the employment at any time, and for any reason, with ninety days' notice.

---

[1] In *Holland v. Mercy Health*, 495 F. Supp. 3d 582, 592 (N.D. Ohio 2020), the district court granted Mercy Health summary judgment, finding Mercy Health—the grandparent entity of St. Vincent and an initial defendant in this lawsuit—was not Holland's joint employer.

Cardiologists who referred patients to St. Vincent for treatment could specify which surgeon would treat the patient. Holland, like St. Vincent's other cardiothoracic surgeons, received referrals that were directed to him. For referrals that were not surgeon-specific, St. Vincent had a system for distributing the referrals. This system is explained in a 2013 email by Dr. Jim Burdine, another cardiothoracic surgeon in the department at that time. That email stated that the surgeon present or on call at the time the referral came in would determine which surgeon would treat the patient, unless the referring physician requested a particular surgeon. Holland contests whether St. Vincent followed this procedure. Instead, he alleges that Andrabi, through his control of Hashmi, and Hashmi, through his role as Medical Director of the department, discriminatorily controlled the referral system by having St. Vincent's office manager divert referrals to Hashmi or by having the referring physicians call Hashmi directly. Notably, Hashmi stepped down as Medical Director around August 2015; he was replaced by Dr. Christopher Phillips, a Caucasian American who joined St. Vincent's cardiothoracic surgery department. The record is devoid of evidence that Holland's referral volumes changed significantly after Phillips became Medical Director.

While practicing at St. Vincent, Holland often complained to St. Vincent officials and personnel about the fact that Hashmi received many more referrals than he did and offered his views that Hashmi was a poor surgeon. By late 2014, Holland shifted his focus to developing a cardiothoracic surgery practice at another local Mercy hospital, Mercy Health – St. Anne ("St. Anne").[2] Holland also continued performing some surgeries at St. Vincent.

---

[2] St. Vincent and St. Anne are wholly owned subsidiaries of Mercy Health. *Holland*, 495 F. Supp. 3d at 591.

On November 28, 2016, after operating under the Services Agreement for almost four years, St. Vincent decided to terminate it based on Holland's failure to build a practice at St. Vincent and his poor relationships with his fellow surgeons, particularly Hashmi. Prior to terminating the Agreement, St. Vincent's then-interim President, Thomas J. Arquilla, met with his executive team to discuss Holland's future with St. Vincent. The group included Andrabi, who had been promoted to CEO of Mercy Health's Toledo region, Brad Bertke, St. Anne's President, and Katrine English, General Counsel. The Services Agreement with TC regarding Holland was due for possible renewal in a year or so. During the group's meetings, they decided that the Services Agreement "no longer benefited the business purposes of Mercy." DE 64, Arquilla Dep., Page ID 1581. The Services Agreement had been in effect for nearly four years, and Arquilla believed Holland failed "to get enough support to eventually, in [Arquilla's] opinion, be successful and that the volume needed to grow at St. Anne's was not happening fast enough." *Id.* Arquilla further explained that the Services Agreement had been an "experiment" designed to strengthen the relationship between St. Vincent and TC and result in TC cardiologists referring their patients to St. Vincent cardiothoracic surgeons. DE 117-10, Arquilla Dep., Page ID 10205–08. But Holland's "relationship[s]" with "his partners" were not "working," and St. Vincent "no longer could be a party to an agreement with the Toledo Clinic when the guy that they had chosen couldn't get along with the other guys, particularly Hashmi." DE 64, Arquilla Dep., Page ID 1642, 1644. Arquilla testified that he did not recommend terminating the Services Agreement because Holland failed to generate any income for St. Vincent, but because the "relationship" between the clinics was not working—in part due to Holland himself—and "[w]e had to have our own employed cardiac surgeon." DE 117-10, Arquilla Dep., Page ID 10205–06. Arquilla gave TC the required

ninety days' written notice on November 28, 2016 that St. Vincent was terminating the Services Agreement, effective February 28, 2017.

On February 24, 2017, Holland filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC").[3]  Arquilla became aware of the EEOC claim in March or April 2017.  In early March 2017, Arquilla began transitioning his role as interim President to the new President, Jeff Dempsey.  For several months leading up to the February 28, 2017 termination of the Services Agreement, Bertke attempted to arrange a Call Agreement with Holland.  Under this proposed agreement, Holland would provide on-call coverage and perform surgeries at St. Anne and St. Vincent.  On February 23, 2017, a St. Vincent paralegal sent Bertke a final version of the proposed Call Agreement.

Bertke—St. Anne's representative—and Holland signed the Call Agreement, and Bertke forwarded it to Arquilla for signature on St. Vincent's behalf.  Arquilla testified he did not promptly sign the agreement because, at the time he received the agreement, he had returned to his prior position as Chief Strategy Officer and no longer had the authority to sign it as Interim President of St. Vincent.  Holland does not contest Arquilla's testimony on this issue; instead, he argues that "even if Arquilla could not sign the agreement, Andrabi 'was also involved as the head of everything' and everything that was signed during this timeframe could have contained either Arquilla's or Andrabi's signature."  CA6 R. 24, Appellant Br., at 24 (quoting DE 129-83, Arquilla Dep., Page ID 13394).  Holland has not submitted any evidence that Andrabi knew of or was asked to sign the Call Agreement.  The Call Agreement was eventually signed by all parties by May 11, 2017.  Holland claims the delay in St. Vincent signing the Call Agreement was a "direct result" of and in retribution for his EEOC claim.  CA6 R. 24, Appellant Br., at 24.

---

[3] Holland's counsel informed St. Vincent of the charge by letter to Andrabi on February 28, 2017.

From February 28, 2017 to May 11, 2017, the period between the termination of the Services Agreement and the signing of the Call Agreement, the record suggests Holland continued taking his normal on-call assignments and performing surgeries. Holland claims that he earned "no income" after St. Vincent terminated the Services Agreement and that he suffered $42,000 in damages from St. Vincent's delay in executing the Call Agreement. CA6 R. 24, Appellant Br., at 61, 64. But, when asked at his deposition whether he worked and got paid for call during this time period, Holland responded that he "assume[d] [he] did" but he could not remember "the specifics." DE 66, Holland Dep., Page ID 2588. He also could not remember whether he received payments by check or direct deposit, and he has not submitted any financial information for this period or any other evidence of damages.

Holland resigned from TC, St. Vincent, and St. Anne in all capacities by March 2018.[4]

## II

We review de novo a district court's grant of summary judgment. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *V & M*, 678 F.3d at 465 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[4] Despite Holland characterizing his resignation as a constructive discharge, he sent a letter notifying TC that he would cease performing surgeries at St. Vincent and St. Anne due to "lack of . . . sustained revenue" under TC's revenue-less-expenses fee model. DE 129-52, Letter, Page ID 13008. Holland does not claim TC was obligated to continue providing his salary without the Services Agreement. Instead, he acknowledges TC "compensated its physicians on a revenue minus expenses model," so with the "termination of the Services agreement eliminating" Holland's salary, "his pay was cut to virtually zero" because he failed to generate referrals sufficient to support a viable practice and fee-based income. CA6 R. 24, Appellant Br., at 62–63.

Summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party "bears the burden of showing that no genuine issues of material fact exist"; the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (first citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); then quoting *Anderson*, 477 U.S. at 250). We "view the facts and draw all reasonable inferences in favor of the non-moving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Then, we "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson*, 477 U.S. at 251–52).

## III

On appeal, Holland claims the district court (1) incorrectly applied the summary judgment standard, (2) erred in finding he failed to prove pretext, (3) erred in finding he failed to prove retaliation, and (4) erred in finding he failed to prove tortious interference with a contract. We address each claim in turn.

## A

Holland claims the district court misapplied the summary judgment standard. We disagree.

The district court identified and applied the correct standard of review in granting St. Vincent summary judgment. For each of Holland's claims, the district court addressed the evidence Holland introduced directly and extensively, and it concluded his claims failed for lack of supporting evidence. Our review is de novo, and we will consider the parties' arguments and the record anew to determine whether Holland has presented a genuine issue of material fact for a jury. *See Anderson*, 477 U.S. at 251–52.

**B**

An employment discrimination claim without direct evidence of discrimination is analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A prima facie case of "reverse discrimination" requires showing that "circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," and that "the employer treated differently employees who were similarly situated but not members of the protected group." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citation omitted). Once a prima facie case is established, the employer must "articulate a legitimate, non-discriminatory reason" for the employee's termination. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007). The burden then shifts back to the employee "to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* (citation and emphasis omitted).

The district court assumed that Holland stated a prima facie case because the outcome "turns on [his] inability to show that St. Vincent's stated reasons for terminating the Services Agreement were pretextual." *Holland v. Mercy Health*, 2021 WL 4391220, at *8 (N.D. Ohio Sept. 23, 2021). St. Vincent's stated reasons for not renewing the Services Agreement were (1) that Holland failed over the five-year duration of the agreement to generate sufficient referrals to build a sustainable practice or to grow St. Vincent's practice, and (2) that Holland could not get along with his partners, particularly Hashmi. To show pretext, Holland must establish that St. Vincent's proffered reasons "(1) [have] no basis in fact; (2) did not actually motivate [his] termination; or (3) [were] insufficient to warrant [his] termination." *Abdulnour*, 502 F.3d at 502. Holland offers

no evidence to rebut either of St. Vincent's legitimate, nondiscriminatory reasons for not renewing the Services Agreement.

First, Holland does not contest that he was unable to generate referrals sufficient to support a viable practice. Instead, he points to the lack of any volume or growth requirements in his contract and to St. Anne's volume increase while he was there. Phillips testified that St. Anne's volume increased but it "was a low volume program from the beginning." DE 115, Phillips Dep., Page ID 9397. Arquilla agreed that Holland was growing the St. Anne cardiothoracic surgery practice but not "fast enough." DE 64, Arquilla Dep., Page ID 1581. Regardless of the volume increase at St. Anne, Holland's performance at St. Anne does not undercut St. Vincent's stated reason that the Service Agreement, which St. Vincent hoped would create a lasting relationship between itself and TC, "wasn't working." DE 64, Arquilla Dep., Page ID 1642.[5] Holland does not contest he was unable to generate enough referrals to support a viable practice at St. Vincent or justify, from St. Vincent's perspective, the roughly $700,000 salary it paid TC every year for his work. In 2015, for example, Hashmi performed over two hundred surgeries, while Holland performed only thirty-two. Holland has not presented any evidence to rebut St. Vincent's evidence that it did not renew the Services Agreement because it no longer made business sense to continue its arrangement with TC. Even if Holland contributed to growth at St. Anne, this does not mean St. Vincent's stated business reasons for terminating the Services Agreement were pretextual.

Relatedly, Holland argues he was "dependent on" St. Vincent for referrals and "the reason that there was not more growth is because of MSV's own actions with regard to discrimination in referrals." CA6 R. 24, Appellant Br., at 43. But, as the district court noted, about eighty percent

---

[5] The Services Agreement was between St. Vincent and TC. Holland fails to explain how his contributions to growth at St. Anne are related to St. Vincent's satisfaction with his performance at its facilities.

of St. Vincent's cardiovascular cases came from Toledo Cardiology Consultants ("TCC"). St. Vincent submitted affidavits from several TCC cardiologists explaining that they did not refer patients to Holland due to personal and professional reasons that largely amounted to Holland being a difficult colleague.[6] Holland also produced no evidence, outside the speculation in his own deposition testimony, that Hashmi improperly deprived him of patients by redirecting referrals away from him.[7]

---

[6] Holland argues that the TCC physicians' affidavits are untrustworthy because there are "numerous inconsistencies" between the physicians' affidavits and depositions, which suggest the physicians were lying about why they declined to refer patients to Holland. CA6 R. 24, Appellant Br., at 45–46. But the statements are not inconsistent. For example, Holland's appellate brief cites to a portion of Alkhateeb's affidavit, which states Alkhateeb was "aware of issues regarding referrals to Dr. Holland and have had some of my own limited experiences and concerns about him." DE 129-25, Alkhateeb Aff., Page ID 12889 (additionally providing examples that gave rise to Alkhateeb's concerns about Holland's patient care and interpersonal skills). Holland claims Alkhateeb's affidavit is inconsistent with his deposition testimony, in which Alkhateeb affirms that he "wouldn't really be involved in who would get the case" after he referred a patient to St. Vincent's. DE 129-89, Alkhateeb Dep., PID 13440. But Alkhateeb's affidavit was explaining why he would not refer cases to Holland. His deposition testimony simply states that if he referred a patient to St. Vincent generally—without specifying a surgeon—he was not involved in St. Vincent's method of assigning a surgeon. Alkhateeb's statements are not inconsistent.

[7] Holland also cites the deposition testimony of St. Vincent Practice Manager Elizabeth Sheroian and St. Vincent Physician's Assistant Adam Carruthers in support of his theory that Hashmi improperly redirected referrals. But neither supports his claim.

Holland cites Sheroian's testimony in support of his claim that "Hashmi controlled the referrals through Elizabeth Sheroian, [St. Vincent's] office/practice manager. Sheroian was supposed to report to the entire practice group, but instead reported only to Hashmi. Referral calls would come into the [St. Vincent] office and would be handled by Sheroian[,] who then sent them to Hashmi [instead of] the on-call physician." CA6 R. 24, Appellant Br. at 11 (citations omitted). But Sheroian's deposition testimony does not support these assertions. The cited portions of her testimony only state that, "in terms of the physician practice," she reported to "[t]he medical director, Dr. Hashmi." DE 129-77, Sheroian Dep., Page ID 13301. Sheroian did not say anything about reporting calls from referring physicians to Hashmi or otherwise comment on Hashmi's involvement with the on-call system; her statement about "report[ing] to" Hashmi "in terms of the physician practice" appear to be testimony about her position within the St. Vincent hierarchy and took place directly after she explained who she "[a]dministratively . . . report[ed] to." *Id.*

Holland cites Carruthers's testimony for the assertion that "Dr. Hashmi controlled the referrals." CA6 R. 24, Appellant Br., at 51. Carruthers testified that, from his time as a Physician's Assistant in the cardiothoracic office, although he "wasn't answering the calls in the office, . . . it seemed

Next, Holland claims St. Vincent's second stated reason for not renewing the agreement—that he could not get along with his partners, particularly Hashmi—is pretextual. Holland concedes he "did not get along with Hashmi," but emphasizes that he "got along great" with Phillips. CA6 R. 24, Appellant Br., at 43. As the district court correctly recognized, "[t]he fact Dr. Holland may have gotten along well with Dr. Phillips does not show that Arquilla's explanation was pretextual." *Holland*, 2021 WL 4391220, at \*9. Holland openly considered Hashmi to be incompetent as a surgeon and inappropriately controlling of the referral system, and the record suggests that Holland frequently shared this view with his colleagues and superiors. Moreover, Holland does not dispute that many of the referring physicians found him difficult. Hashmi was the backbone of St. Vincent's cardiothoracic surgery practice, and Holland has offered no evidence that St. Vincent's allegation of his failure to get along with Hashmi and others had no basis in fact, did not actually motivate his termination, or was insufficient to warrant his termination. *Abdulnour*, 502 F.3d at 502.

Holland has failed to raise a genuine issue of material fact that St. Vincent's proffered reasons for not renewing the Services Agreement were pretextual. We affirm the district court's grant of summary judgment to St. Vincent on Holland's "reverse discrimination" claim.[8]

---

like [the referrals] mostly went to Dr. Hashmi whether he was on call or not. And on top of that, a lot of referrals were called directly to Dr. Hashmi to his cell phone or to the operating room where he was operating." DE 129-80, Carruthers Dep., Page ID 13319. But Carruthers provided no basis for his comment that it "seemed like" the referrals mostly went to Hashmi. Hashmi receiving referrals to his cellphone is only evidence that Hashmi received referrals; it is not evidence that he manipulated the referral process, let alone that he did so based on the race or national origin of the doctors.

[8] Holland also takes issue with the district court's determination that he and Hashmi were not "similarly situated" for purposes of a reverse discrimination claim. CA6 R. 24, Appellant Br., at 49. But a plaintiff need only prove that they are "similarly situated" to another employee as part of a prima facie case for discrimination. *Murray,* 770 F.2d at 67. Because we do not disturb the district court's assumption that Holland made a prima facie showing of discrimination, we need not address this claim on appeal.

**C**

Holland claims St. Vincent retaliated against him for filing an EEOC charge in violation of Title VII by delaying the signing of the Call Agreement. Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, the plaintiff-employee must show "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the [employer]; (3) thereafter, the [employer] took an action that was 'materially adverse' to the [employee]; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted). "Examples of materially adverse actions are 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 470 (6th Cir. 2012) (citation omitted).

Holland contends he suffered a material loss of benefits because of the delay in signing his Call Agreement. But he failed to support this claim with evidence. At his deposition, Holland was asked "[b]etween March 1 of 2017 and May 10 of 2017, did you work and get paid for call?" DE 129-70, Holland Dep., Page ID 13201. He answered, "I assume I did, but I don't know the specifics." *Id*. Holland could not remember whether he received payments by check or direct deposit, and he did not know whether he "received a W-2 form for [his] compensation or a 10[]99 form for work performed" under the Call Agreement. *Id*. When asked whether he had "any estimate of [his] damages for not being eligible for call between March 1 and May 10 of 2017,"

Holland stated: "Well, theoretically it would just be whatever the terms are called for here times -- that was a three-month period. Times 30." *Id.* On appeal, Holland claims he suffered $42,000 in lost income due to the delay. He arrives at this number by multiplying the Call Agreement's provision of $1,400.00 per day for providing call by thirty, the total number of days of call he claims he lost per month. But Holland has not provided any evidence showing he did not work or was not paid during the delay.

Viewed in the light most favorable to Holland and drawing all reasonable inferences in his favor, Holland has failed to establish a genuine factual issue as to whether he suffered a materially adverse action. He has not presented any evidence that he did not perform his regular on-call work during the time in which the Call Agreement was delayed. Rather, the evidence indicates he continued to work. He also has not introduced any evidence that St. Vincent failed to pay him during the delay. This lack of evidence combined with Holland's own statement that he assumed he worked and got paid for being on-call from March 1 to May 10, 2017, fail to raise a genuine factual issue as to whether Holland suffered a materially adverse action. Because Holland has failed to establish an essential element of his claim, we affirm the district court's grant of summary judgment to St. Vincent on the retaliation claim.

**D**

Holland claims St. Vincent tortiously interfered with his employment contract with TC under Ohio state law. To prevail on a tortious interference claim, the Ohio Supreme Court has explained that the plaintiff must prove "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*,

707 N.E.2d 853, 858 (Ohio 1999). We agree with the district court that Holland's tortious interference with contract claim fails.

Assuming for the sake of argument that Holland can show that TC breached the Employment Agreement, resulting in a loss of income to him, he cannot show St. Vincent lacked justification for terminating the Services Agreement. Lack of justification "requires proof that the defendant's interference with another's contract was improper." *Fred Siegel*, 707 N.E.2d at 858. Ohio courts have explained that "one is privileged to purposely cause another not to perform a contract with a third person where the defendant, in good faith, is asserting a legally protected interest of his own which he believes will be impaired or destroyed by the performance of the contract." *Bridge v. Park Nat'l Bank*, 903 N.E.2d 702, 708 (Ohio App. 2008). Thus, a company's officers and directors may "interfere with contracts in the furtherance of their legitimate business interests." *Id*.

As discussed above, St. Vincent was dissatisfied with Holland's inability to grow a practice at St. Vincent. Holland does not dispute he failed to grow a practice at St. Vincent. In not renewing the Services Agreement, St. Vincent acted in what it reasonably believed to be its legitimate business interest. Moreover, St. Vincent could terminate the Services Agreement without cause at any time after one year by giving the other party ninety days prior written notice. St. Vincent gave sufficient notice. St. Vincent paid TC, and thereby Holland, in full for the duration of the agreement. Holland presents no argument or evidence creating a genuine issue of material fact to the contrary. Therefore, summary judgment in St. Vincent's favor was warranted on Holland's tortious interference with contract claim.

**IV**

Holland has failed to raise a genuine issue of material fact on any of his three claims. His discrimination claim fails for lack of evidence supporting his claim of pretext. His retaliation claim fails for lack of evidence showing a materially adverse action. His tortious interference of contract claim fails for lack of evidence showing breach or illegitimate reasons. The evidence is "so one-sided that one party," St. Vincent, "must prevail as a matter of law." *Pittman*, 901 F.3d at 627–28 (quoting *Anderson*, 477 U.S. at 251–52). We affirm the district court's grant of summary judgment to St. Vincent.