RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

HAROLD WASEK,

       *Plaintiff-Appellant,*

    v.

ARROW ENERGY SERVICES, INC.,

       *Defendant-Appellee.*

No. 10-2418

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 09-11350—Thomas L. Ludington, District Judge.

Argued: March 8, 2012

Decided and Filed: June 20, 2012

Before: GRIFFIN and KETHLEDGE, Circuit Judges; and THAPAR, District Judge.[*]

————————————

## COUNSEL

**ARGUED:** Mandel I. Allweil, HURLBURT, TSIROS & ALLWEIL P.C., Saginaw, Michigan, for Appellant. Deanna Swisher, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, for Appellee **ON BRIEF:** Mandel I. Allweil, HURLBURT, TSIROS & ALLWEIL P.C., Saginaw, Michigan, for Appellant. Deanna Swisher, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, for Appellee.

————————————

## OPINION

————————————

    AMUL R. THAPAR, District Judge. Harold Wasek claims that he was harassed and bullied while working for his employer, Arrow Energy Services, Inc. He cannot show, however, that the bullying and harassment occurred because of his gender. As

————

    [*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

such, Wasek cannot maintain an action under either Title VII or Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"). Thus, we affirm the district court's grant of summary judgment to Arrow Energy.

I.

Arrow Energy is in the business of servicing oil wells and has approximately thirteen active rigs and eighty hourly employees throughout Michigan, Pennsylvania, New York, and West Virginia. In April 2008, Arrow Energy hired Wasek as a derrick hand, an individual that works in the tower of an oil rig.

Arrow Energy assigned Wasek to work on a four-man crew in Pennsylvania. Here he met his eventual tormenter, Paul Ottobre. In order to save money, Wasek and Ottobre initially shared a hotel room, but this arrangement did not last long. Ottobre discovered that he could rile Wasek with sexually explicit stories when he told Wasek of one of his purported conquests—having sex with his wife's sister. The two stopped rooming together the next day because, according to Wasek, Ottobre sensed they would not get along.

On the rig, Ottobre began touching Wasek in a sexual manner: grabbing his buttocks, poking him in the rear with a hammer handle, and poking him in the rear with a long sucker rod. On each occasion, Wasek reacted by cursing and demanding that he not be touched. Ottobre further inflamed the situation with comments such as "you've got a pretty mouth," "boy you have pretty lips," and "you know you like it sweetheart." Ottobre did not relent: he told sexually explicit jokes, stories, fantasies, and called Wasek names. Wasek believed that Ottobre acted like this because he was bisexual.

Wasek found no help from his rig boss, Pat Tripp. Tripp observed some of these incidents and laughed instead of intervening. When Wasek complained to Tripp directly, he advised Wasek not to report to Dick Smillie, the Director of Operations in Michigan, or Tripp would put Wasek on a "starvation schedule" and run him off the job. Tripp advised Wasek repeatedly not to "make waves" with superiors by "whining."

Eventually Tripp advised Wasek that he would "handle" the problem, but Ottobre's behavior continued.

The situation came to a head over the course of two days of events. First, on September 10, 2008, Wasek struggled with heavy equipment on the rig and Ottobre began making fun of him. Frustrated, Wasek shoved Ottobre and threatened a physical altercation if Ottobre continued teasing him. Tripp observed this and told both men to get back to work. Wasek and Ottobre did not speak to each other for the rest of the day.

On September 11, 2008, Wasek found his styrofoam cooler, normally located in the crew's truck, in the hotel dumpster. Later in the day, Wasek also discovered that he was missing a one-hundred dollar bill and cigarettes that he had left in a personal storage area. Wasek believed Ottobre was responsible for all of this, but did not report the incidents. When the crew returned to the hotel that night, Wasek entered Ottobre's hotel room to ask him for the keys to the crew's shared truck so that Wasek could get dinner. Ottobre refused, saying he had just put gas in the truck and if Wasek wanted to use it he would have to put fuel in the truck too. Wasek reminded Ottobre that Smillie put Wasek in charge of the truck and said he was only traveling half a mile down the road. Ottobre still refused.

Wasek left the room and called Smillie. Wasek complained about the truck, but also told Smillie about Ottobre's sexual touching and sexual comments. Additionally, Wasek informed Smillie that he had reported it all to Tripp who had done nothing. Smillie responded, "Why don't you just kick [Ottobre's] ass?" R. 26-1 at 56. Wasek implored Smillie to do something, and Smillie agreed to call Ottobre. A short time later, Smillie called Wasek back and told him to get the keys from Ottobre. When Wasek returned to the room, Ottobre's roommate informed him that Ottobre had just left with the truck.

Frustrated, Wasek called Smillie once more. This time, Smillie told Wasek that he needed to call Bill Strong, the Director of Operations in Pennsylvania, because "[h]e's in charge down there." *Id.* Wasek called Strong and unloaded all of his problems with Ottobre, including the truck keys and sexual touching. Strong's initial

reaction was to chastise Wasek for "whining." *Id.* at 57. Strong then suggested that Wasek and Ottobre should just "duke it out" to "get it out of [their] systems." *Id.* Wasek demanded that Strong do something about Ottobre that evening or else Wasek would "be gone by morning." *Id.* at 58. Strong said he would not do anything that night but would see Wasek in the morning. Wasek responded "No, you won't" and hung up the phone. *Id.* Frustrated that no one would help, Wasek called his wife to pick him up from the job site. She arrived the next day, and Wasek left after taping a sign to his hotel door stating, "I'm not here. I went home."

On the way home, Ottobre called Wasek on his cell phone. In one voicemail, Ottobre stated, "I miss holding you. I miss spooning with you. I love you. Please call me back." Erica Comei, a human resources representative for Arrow Energy, also called Wasek, asking why he quit his job. Wasek stated that he did not intend to quit, but that he did not want to work with Ottobre any longer and described to her all of Ottobre's antics. In response, Comei stated she would arrange for Wasek to meet with Smillie and Rob Short, the regional supervisor.

The meeting occurred a few days later. Short was extremely upset that Wasek had left his crew "high and dry." R. 26-1 at 72. The crew had always been a four-man team, *id.* at 21, but with Wasek gone, Short could not "just send somebody out" to replace Wasek "in a couple of hours" because the crew was "600 miles away" from the Michigan office. *Id.* Wasek then described Ottobre's behavior and stated that he left because he was fed up. Short responded that this is "the way the oil field is" and that if Wasek could not handle it he "should find another line of work." *Id.* at 73. Wasek demanded that the matter be resolved and that he be put back on a crew. Short responded that Wasek could "rest assure[d]" he would not "be going back to Pennsylvania ever" because the staff was upset that Wasek had left them "high and dry." *Id.* at 72–74. But Short assured Wasek that "we're not going to terminate you." *Id.* at 74. Smillie ended the meeting by telling Wasek that he was "digging into what we've got for you." *Id.*

On October 3, 2008, Arrow Energy provided a training session for Wasek and assigned him to work on a rig in Michigan beginning October 21, 2008. Wasek asserts that he called Arrow Energy on a regular basis throughout this time asking for immediate work. He soon became frustrated with the financial burden placed on his family from not working. Wasek decided to apply to other jobs and started work with Stone Well Service in West Virginia on October 12, 2008. Arrow Energy did not know that Wasek took on new employment until October 21, 2008, when Wasek did not show up as assigned.

On September 9, 2009, Wasek filed suit against Arrow Energy alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–5(g), and ELCRA, Mich. Comp. Laws § 37.2201 *et seq.* Wasek made hostile work environment and retaliation claims under both statutes. The district court granted Arrow Energy's motion for summary judgment on all claims. Wasek appealed.

## II.

We review the district court's grant of summary judgment *de novo*. *Thom v. Am. Std., Inc.*, 666 F.3d 968, 972 (6th Cir. 2012). We must view evidence in the record in the light most favorable to the nonmoving party and draw all reasonable inferences to that party's benefit. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is appropriate only when there is no genuine issue of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A.    Hostile Work Environment—Title VII

Title VII prohibits discrimination "because of . . . sex" in the "terms" or "conditions" of employment. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of discriminatory treatment and is actionable whether it involves members of the same gender or different genders. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). But Title VII is not "a general civility code for the American workplace." *Id.* at 80. Instead, the focus in a sexual harassment claim is "whether members of one sex

are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). In other words, the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender.

This focus on discrimination creates key evidentiary differences between mixed-gender and same-gender sexual harassment. An inference of discrimination is "easy to draw" with male-female sexual harassment. *Id.* In these traditional claims, "it is reasonable to assume" that the harassment would not have been done to members of the same sex. *Id.* But that inference is not automatically available with same-sex harassment. *Id.*

So how does a plaintiff prove Title VII same-sex harassment? *Oncale* provides guidance. A trier of fact may infer that harassment occurred because of sex when the plaintiff can produce (1) "credible evidence that the harasser was homosexual," (2) evidence that "make[s] it clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace," or (3) "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.*

Wasek's evidence can only fit into the first of these three routes. No evidence exists that Ottobre was motivated by a general hostility towards men. And the oil rig was not a mixed-sex workplace, so there is no possibility of comparative evidence. Thus, in order to infer discrimination, Wasek must demonstrate that Ottobre was homosexual. In his deposition, Wasek speculated that Ottobre was "a little strange, possibly bisexual." R. 20-2 at 31.

We need not delve into what inferences–if any–might be drawn from a harasser's bisexuality. A single speculative statement in a deposition cannot be the first link in the "chain of inference" that *Oncale* recognizes may follow from the harasser's non-heterosexuality. 523 U.S. at 80. *Oncale* requires "credible evidence" of the harasser's sexual orientation in order to draw inferences based on it. *Id.* And Wasek offers no evidence of Ottobre's sexuality other than the pure conjecture that Ottobre was "possibly

bisexual." R. 20-2 at 31–32.  Such speculation falls well short of the credible evidence standard set forth in *Oncale*.  *Cf. Johnson v. Hondo, Inc.*, 125 F.3d 408, 413 (7th Cir. 1997) (holding that a Title VII plaintiff "weakly assert[ing] that [the harasser] 'very possibly' was a homosexual . . . is no showing at all").  Therefore, Wasek's Title VII hostile work environment claim cannot survive.

**B.     Hostile Work Environment-ELCRA**

The ELCRA hostile work environment analysis is identical to Title VII's analysis.  Like Title VII, ELCRA prohibits employment discrimination "with respect to a term" or "condition . . . of employment, because of . . . sex."  Mich. Comp. Laws § 37.2202(1)(a).  And when Title VII and ELCRA have similarly worded provisions, Michigan courts often interpret ELCRA provisions using Title VII case law.  *See, e.g., Pena v. Ingham Cnty. Road Comm'n*, 660 N.W.2d 351, 358 n.3 (Mich. Ct. App. 2003).

In fact, in *Robinson v. Ford Motor Co.*, 744 N.W.2d 363, 369 (Mich. Ct. App. 2007), a Michigan court held that, "consistent with *Oncale*," the "threshold question" in a same-sex sexual harassment claim under ELCRA is whether the "harasser's conduct 'constituted discrimination . . . because of . . . sex.'"  *Id.* (quoting *Oncale*, 523 U.S. at 81).  The court also endorsed *Oncale*'s three "evidentiary routes."  *Id.* at 369–70.  Thus, contrary to Wasek's assertion, *Robinson* makes clear that the Title VII analysis applies to Wasek's ELCRA claim.  Wasek has not satisfied either statute's requirement that he present evidence that Ottobre harassed Wasek because of his gender.  As a result, the district court rightly dismissed Wasek's hostile work environment claims under both Title VII and ELCRA.

III.

**A.     Retaliation—Title VII**

Title VII also prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice."  42 U.S.C. § 2000e-3(a).  In order to make a prima facie case of retaliation, Wasek must show that (1) he engaged in protected activity; (2) Arrow Energy knew Wasek exercised his civil rights; (3) Arrow Energy

took adverse employment action against Wasek; and (4) there was a causal connection between Wasek's protected activity and the adverse employment action. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

### 1.     Protected Activity

Wasek engaged in protected activity when he complained about Ottobre to his superiors. Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ("EEOC") and opposition to an apparent Title VII violation. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). Wasek did not file a complaint with the EEOC, but complaining about allegedly unlawful conduct to company management is classic opposition activity. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) ("The [EEOC] has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . .").

Still, in order to obtain Title VII's retaliation protections, Wasek must have had "a reasonable and good faith belief" that the harassing acts he was reporting were Title VII violations. *Id.* at 579 (citing *EEOC Compliance Manual*, (CCH 8006)). This rule illuminates an important point for this case: even though Wasek did not suffer sexual harassment under Title VII, he does not need to oppose actual violations of Title VII in order to be protected from retaliation. *See id.* at 579–80 ("[A] violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful."); *Booker*, 879 F.2d at 1312–13 ("A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful.").

When plaintiffs cannot satisfy the reasonable, good faith belief standard, an unreasonable mistake of law is generally the problem. *See*, *e.g., Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 748 (6th Cir. 1986) (holding that the plaintiff's insistence that the defendant implement an affirmative action program could not be considered opposition to a Title VII violation because Title VII does not require the

adoption of affirmative action programs).  In other cases, there are not facts from which a plaintiff could have reasonably believed that a violation occurred.  *See David v. ANA Television Network, Inc.*, 208 F.3d 213, 2000 WL 222575, at *5 (6th Cir. 2000) (unpublished table decision) (holding that the plaintiff "could not reasonably have believed that his threats of legal action were in response to discriminatory acts" because there was "absolutely no evidence from which a reasonable person could conclude that" discrimination occurred).  Wasek's case is different.  He failed to provide evidence that Ottobre abused Wasek because of his gender.  But Wasek's claim is not based on an unreasonable mistake of law, and it is not so devoid of factual support as to be patently unreasonable.

The question is therefore whether Wasek could have had a reasonable, good faith belief that he was being sexually harassed.  He definitely could have.  Wasek suffered unwanted sexual touching and communication in the workplace on multiple occasions.  And he made it known both to his alleged harasser and his immediate supervisor that he did not find the behavior appropriate.  Further, Ottobre's touching was particularly offensive.  This was not a football coach smacking a player on the buttocks before heading onto the field, or co-workers brushing up against each other when working in tight quarters.  Indeed, it is difficult to imagine a work place social context where simulated sodomy would be acceptable, let alone among an all-male crew on an oil rig.  *See Oncale*, 523 U.S. at 81 (determining the objective severity of harassment "requires careful consideration of the social context in which a particular behavior occurs").  And any contention that this is "the way the oil field is" was not supported by evidence in the record.  Rather, the facts demonstrate that Wasek could have reasonably believed he was sexually harassed.

Finally, it does not affect our analysis that Wasek was able to continue doing his job and give his best effort.  *Cf. Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) ("[A] plaintiff need not prove a tangible decline in her work productivity; only that the harassment made it more difficult to do the job." (internal quotation omitted)).  Contrary to Arrow Energy's position, Wasek does not need to

demonstrate that he lived in a state of perpetual fear in order to show that he truly believed he was being harassed.  A plaintiff does not need to have an egg-shell skull in order to demonstrate a good faith belief that he was victimized.  *Cf. Harris*, 510 U.S. at 23 (holding that "psychological harm, like any other relevant factor, may be taken into account, [but] no single factor is required").  The facts of this case show that it was reasonable for Wasek to believe he was the victim of sexual harassment, even if that belief was ultimately at odds with the law.  Thus, Wasek's complaints about sexual harassment were protected activity.

### 2.     Knowledge

The parties do not dispute that Wasek satisfies the second requirement of a retaliation claim.  Arrow Energy knew Wasek exercised his rights because Wasek made complaints to company management.  *See Johnson*, 215 F.3d at 580.

### 3.     Adverse Employment Action

Arrow Energy took adverse employment action against Wasek when Arrow banned him from working in Pennsylvania.  Retaliatory acts by an employer are not actionable unless they are "materially adverse" to a plaintiff's employment.  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir.1996).  Examples of materially adverse actions are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461–62 (6th Cir. 2000).

Viewed in the light most favorable to Wasek, the evidence demonstrates that his ban from Pennsylvania was both real and materially adverse.  Dick Smillie contends that Wasek was only told he could not return to his former crew in Pennsylvania, R. 26-2 at 30, and Rob Short did not remember what was said, R. 26-3 at 37–38.  But making inferences in Wasek's favor, as we are required to do, Wasek's testimony, coupled with the fact that he was reassigned to Michigan, takes Wasek's allegations outside the realm of an unfulfilled threat.  *Cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54

(1998) (unfulfilled threats not resulting in tangible employment action are actionable under Title VII only by means of a hostile work environment claim).  Furthermore, the ban was materially adverse to Wasek's employment because nine of Arrow Energy's thirteen rigs are in Pennsylvania.  Wasek's future employment options were severely limited.  *See Barton v. Zimmer*, 662 F.3d 448, 454 (7th Cir. 2011) (noting that adverse employment actions include transfers that reduce future career prospects).  Rob Short suggested that the number of Pennsylvania rigs might have been fewer than five at the time Wasek was reassigned to Michigan, Short Depo., R. 26-3 at 14, but again, we must view the evidence in the light most favorable to Wasek.  When we do, the facts indicate that Wasek suffered a materially adverse employment action.

Wasek also contends that Arrow Energy's one-month delay in reassigning him was an adverse change in the terms and conditions of his employment.  The delay may have caused Wasek personal financial difficulty, but a short and justifiable delay, without more, is not an adverse employment action.  *Haywood v. Lucent Technologies*, 323 F.3d 524, 532 (7th Cir. 2003) (holding that a justified delay without "a quantitative or qualitative change in the terms or conditions of employment" was not an adverse employment action).  That is especially true here where Wasek has not demonstrated how the short delay materially changed the terms and conditions of his employment.  At most, the delay was an inconvenient result of the Pennsylvania ban, not a separate basis for Wasek's retaliation claim.

### 4.    Causation

Wasek's claim fails, however, because he has not demonstrated a causal connection between his protected activity—the complaints—and Arrow Energy's adverse employment action—the Pennsylvania ban.  All of the available evidence, including Wasek's own deposition, indicates that the ban was a result of Wasek leaving his work site.  *See, e.g.*, Wasek Dep., R. 26-1 at 73 ("Well, I can rest assure you, you won't be going back to Pennsylvania ever.  They're pissed off that you left the way that you did.") (Wasek quoting Rob Short); *Id.* at 71 ("Rob [Short] . . . was pissed off that I left and what a terrible situation I put them in.  They had nobody.  Being 600 miles away

you can't just send somebody out to the job in a couple of hours."). There is no indication that the ban was connected to Wasek's complaints or that Arrow Energy took any other adverse action because of the complaints.

Leaving the work site could be protected activity if leaving itself were a "complaint" about sexual harassment. But this would require a fact-intensive inquiry into whether or not leaving the work site was reasonable under the circumstances. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 722 (6th Cir. 2008) (determining whether conduct is protected by Title VII's opposition clause requires a "careful balancing" between the employer's need to maintain an orderly workplace and safeguarding employees that oppose discriminatory work practices); *Johnson*, 215 F.3d at 580 ("[T]he only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable."). Wasek, however, did not argue to the district court or to this Court that leaving is protected activity. Throughout this litigation, Wasek has only asserted that his verbal complaints to his superiors are protected activity. *See* R. 26 at 12–13; Appellant's Br. 36–37, 40, 41. And at this stage in the process, it would be improper to create arguments for Wasek in order to reach this issue. *See Citizens Coal Council v. EPA*, 447 F.3d 879, 905 (6th Cir. 2006) (en banc) ("[T]he panel majority erred in ruling on grounds not raised by the parties. Because it was improper for the panel majority to reach issues not briefed by the parties, . . . we decline to reach those issues here."). Without a causal connection, Wasek has not presented a prima facie case of Title VII retaliation.

Wasek counters that causation can be inferred based on the timing of the adverse action. But we have repeatedly cautioned against inferring causation based on temporal proximity alone. *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007)); *but see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525–26 (6th Cir. 2008) (reasoning that temporal proximity may be enough when it so closely follows

the protected activity that there would be no other evidence to couple with the temporal proximity).  The timeline of events in this case extinguishes any inference based on temporal proximity.  Wasek's decision to leave the worksite was an intervening event. He left after his last complaint to his supervisors and before he was banned from Pennsylvania. Arrow Energy thus had an intervening legitimate reason to discipline him, and that reason dispels an inference of retaliation based on temporal proximity.  *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (holding that an intervening "obviously nonretaliatory basis" for the adverse action is evidence negating temporal proximity).  And Wasek has presented no additional evidence to discredit Arrow's non-retaliatory basis or otherwise support the inference that he asks this Court to make.  Without such additional evidence, Wasek's claim cannot survive summary judgment.

## B.        Retaliation—ELCRA

Once again, the ELCRA analysis is identical to the Title VII analysis.  ELCRA prohibits retaliation against an employee who has "opposed a violation of [ELCRA]." Mich. Comp. Laws § 37.2701(a).  In *Garg v. Macomb County Community Mental Health Services*, 696 N.W.2d 646 (Mich. 2005), amended 699 N.W.2d 697, the Michigan Supreme Court adopted the Title VII prima facie factors to establish a retaliation claim under ELCRA.  *Id.* at 653 (citing *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661 (Mich. Ct. App. 1997)).  Additionally, Michigan courts have incorporated the same definitions and principles found in Title VII retaliation case law.  *See, e.g.*, *Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009) ("Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation." (quoting *Wilcoxin v. Minnesota Mining & Mfg. Co.*, 597 N.W.2d 250, 258 (Mich. Ct. App. 1999)) (internal quotation marks omitted)).  Thus, our Title VII retaliation analysis applies to Wasek's ELCRA claim.

IV.

For these reasons, we affirm the judgment of the district court.