NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0276n.06

Case No. 24-3980

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 05, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| SKY SCHELLE, | ) | |
|     Plaintiff-Appellant, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| CITY OF PIQUA, OHIO, et al. | ) | COURT FOR THE SOUTHERN |
|     Defendants-Appellees. | ) | DISTRICT OF OHIO |
|  | ) | |
|  | ) | O P I N I O N |

Before: McKEAGUE, MURPHY, and DAVIS, Circuit Judges.

**McKEAGUE, Circuit Judge.** Sky Schelle worked for the city of Piqua. During a meeting, Kevin Krenjy—Schelle's supervisor—made inappropriate comments about another employee who was not present at the meeting. Schelle reported these comments to Human Resources as potential sexual harassment. Within a month of the incident, Schelle was notified that his position was abolished as part of a city reorganization effort to improve efficiency. Schelle brought a Title VII suit against Piqua and its officials, claiming that his position was abolished in retaliation for reporting Krenjy's comments. The district court granted the defendants summary judgment because Schelle was unable to establish a prima facie case for Title VII retaliation. For the following reasons, we **AFFIRM**.

**I.**

Schelle worked for the city of Piqua as a Storm Water Program Manager from February 2017 to December 2021. Schelle was part of Piqua's Underground Utilities Department and was responsible for managing and maintaining the city's storm water system. He oversaw the construction and maintenance of storm water infrastructure and ensured that it complied with storm water permits.

On September 29, 2021, Schelle and three other Piqua employees attended a budget meeting with Utility Director Kevin Krenjy. During the meeting, the conversation veered into how Kenton Kiser—a junior city employee within the engineering department—was "rubbing people raw" by being "overzealous" and "hindering/critiquing" other departments even though Kiser himself did not have the sufficient "background/exp[erience]" to act that way. Witness Statements, R. 36-6 at PageID 657. In one instance, Kiser objected to the use of a "Road Closed" sign when the city was closing a parking lot rather than a road. Schelle Email Statement, R. 26-2 at PageID 184. Responding to this incident and Kiser's apparent zeal for doing things by the book, Krenjy commented: "Can you imagine [Kiser] with his girlfriend on a Friday night? They're going at it and he stops her to correct her technique. He's probably got a book he follows and gets it out to go over the positions so he gets everything just right." *Id.*

Schelle did not appreciate the comments. He was "bothered" by the "crude manner" in which Krenjy "degrade[d]" Kiser, Schelle Dep., R. 26 at PageID 158, and he was concerned that "as a junior employee that had drawn the ire of a senior staff member . . . [Kiser's] career growth and stability in the organization . . . might be jeopardized." *Id.* at PageID 157. The next day, Schelle reported his concerns to Human Resources Director Catherine Bogan.

Bogan further investigated the matter. She interviewed everyone who was at the meeting. They characterized the comments as "shop talk" and explained that they did not find the comments "offensive" or "inappropriate." Witness Statements, R. 36-6 at PageID 656–57. Bogan then discussed the matter with City Manager Paul Oberdorfer. Considering that Krenjy did not have a record of discipline and Schelle was the only person offended—even though the comments were not directed at him— Bogan and Oberdorfer decided that the comments did not rise to the level of harassment and agreed that a verbal warning was an appropriate response.

Oberdorfer and Bogan met with Krenjy and explained that while his conduct did not "rise to the level of harassment, it [was] certainly inappropriate, unprofessional, [and] embarrassing to [the] leadership team." Bogan Dep., R. 31 at PageID 358. Krenjy was "remorseful and agreed [that] his comments were inappropriate and should have been withheld." Oberdorfer Aff., R. 27-2 at PageID 249. After informing Schelle of the outcome, Bogan closed the matter on October 5, 2021. Schelle also let the matter rest.

Soon after, Schelle noticed some changes. First, Krenjy asked Schelle to copy him on emails to anyone outside the city, which was not something Schelle had to do in the past. Krenjy explained that he wanted to stay informed on the projects under him, even if he did not think he would necessarily respond or act on such emails. Next, Schelle was uninvited from a long-term budgeting and planning meeting that was scheduled to occur in October. The meeting was on Schelle's schedule for several weeks before he was notified that his attendance was no longer required. Schelle did not dwell on the recission because he "was in the middle of a very complex project . . . [and] had a lot of other things going on." Schelle Dep., R. 26 at PageID 160.

On November 1, 2021, Bogan and Oberdorfer informed Schelle that his position as Storm Water Manager would be abolished as part of a "reorganization" effort to improve "efficien[cy]"

and "economy" of city operations. Notice of Abolishment, R. 26-3 at PageID 185. Schelle's position was scheduled to officially end on December 31, 2021. *Id.* Schelle asked when the decision to abolish the position was made; Oberdorfer replied that the information was not relevant.

Schelle was naturally shocked by the news, in part because he had access to a "pro forma budget" that Krenjy created in June 2021 depicting Schelle's name, position, and salary increases for the next several years. Schelle Dep., R. 26 at PageID 163. Concerned that the reporting of Krenjy's comments played a role, Schelle tried to appeal the abolishment of his position. But the Civil Service Commission denied his request for a hearing. The Commission explained that under the Piqua City Charter, the only way for a nonunion at-will employee to appeal an adverse employment decision was to seek a public hearing with the City Manager. Schelle received such a hearing on December 20, 2021. Schelle did not argue or present any information at the hearing but sought answers to several questions. In a written response, Oberdorfer explained that Schelle's position was abolished as part of a city reorganization effort that began in January 2021 and continued until December 2021. Schelle's position was one of nine positions that were removed "through attrition, layoff, or abolishment" during that time. Section 32 Hearing, R. 27-2 at PageID 252. He further stated that the decision to abolish Schelle's position was made in May 2021, several months before Schelle reported Krenjy's comments to Human Resources. After the hearing, Oberdorfer upheld the decision to abolish the position.

Schelle initiated this lawsuit. Schelle alleged that defendants—Piqua, Oberdorfer, and Krenjy—retaliated against him for reporting Krenjy's comments to Human Resources by abolishing his position, in violation of Title VII of the Civil Rights Act and Ohio Rev. Code § 4112.02(I). Schelle also brought a claim under Ohio Rev. Code § 4112.02(J) against Krenjy and

Oberdorfer for aiding, abetting, and inciting the retaliatory firing. He sought damages and injunctive relief.

The defendants moved for summary judgment. They argued that Schelle did not engage in protected activity when he reported Krenjy's comments because it was not objectively reasonable for Schelle to believe he was opposing unlawful discrimination. And even if Schelle engaged in protected activity, the defendants argued that Schelle failed to show that his report to Human Resources caused the abolishment of the position because the decision was made well before the September meeting.

The district court granted the defendants' motion for summary judgment. The court held that Schelle did not engage in protected activity and therefore failed to establish a prima facie case of Title VII retaliation. The district court also held that without any underlying violation, Schelle's claim of aiding and abetting retaliation also failed. This appeal followed.

## II.

This court reviews a grant of summary judgment de novo. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 (6th Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We affirm a grant of summary judgment where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (cleaned up).

## III.

On appeal, Schelle argues that the district court erred in granting summary judgment to the defendants on his Title VII retaliation claim because "a reasonable jury could conclude that [he] had a good faith belief that the comments he reported were unlawful." Appellant Br. 13–14. He

further claims that because he established a Title VII retaliation claim, the district court erred in granting summary judgment to the defendants on his aiding and abetting claim under Ohio Rev. Code § 4112.02(J). We address each argument in turn.

**A.**

Begin with Schelle's Title VII retaliation claim. Title VII prohibits an employer from, among other things, discriminating against any individual because of that individual's sex. 42 U.S.C. § 2000e–2. Workplace sexual harassment constitutes such discrimination "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nathan*, 992 F.3d at 564–65 (cleaned up). Furthermore, Title VII prohibits an employer from retaliating against an employee for opposing such harassment. *See* 42 U.S.C. § 2000e–3(a).

When a plaintiff advances circumstantial evidence to support a Title VII retaliation claim, as Schelle does here, we analyze the claim using the *McDonnell Douglas* burden-shifting framework. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Under this framework, the "[p]laintiff bears the initial burden to establish a prima facie case of retaliation." *Id.* To meet this burden, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant knew that the plaintiff was exercising his civil rights; (3) the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). If the plaintiff succeeds, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason for its actions." *Laster*, 746 F.3d at 730. If the employer satisfies this burden, then the burden shifts back to the plaintiff to demonstrate that the employer's reason for its action

was not the true reason. *Id.* The plaintiff retains the burden of persuasion throughout this process. *Id.*

Here, the district court held that Schelle failed to establish a prima facie case for Title VII retaliation because he did not engage in protected activity when he reported Krenjy's comments to Bogan. We agree. Title VII recognizes two types of protected activity: opposition to potential Title VII violations and participation in an Equal Employment Opportunity Commission proceeding. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). "[C]omplaining about allegedly unlawful conduct to company management is classic opposition activity." *Id.* Although a plaintiff need not complain about actual Title VII violations to take advantage of Title VII protections, the plaintiff must still have had "a reasonable and good faith belief" that the harassing acts he was reporting were Title VII violations. *Id.* (citation omitted). Therefore, to establish that Schelle engaged in protected activity, he must have had "a reasonable and good faith belief" that Krenjy's comments amounted to sexual harassment sanctionable under Title VII. *Id.*

Sexual harassment is actionable under Title VII when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[1] *Nathan*, 992 F.3d at 564–65 (citation omitted). When judging whether such an environment exists, we look to all circumstances "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Cnty. Sch. Dist. v. Breeden*,

---

[1] To successfully bring a Title VII sexual harassment claim, a plaintiff must show, among other things, that the "harassment complained of was based on sex." *Schlosser v. VRHabilis*, 113 F.4th 674, 683 (6th Cir. 2024). We do not hold one way or another on whether Krenjy's comments were based on Kiser's sex—something that was not raised by the parties below or discussed at the district court—but proceed to the Title VII retaliation claim merely assuming Krenjy's comments were based on Kiser's sex.

- 7 -

532 U.S. 268, 270–71 (2001) (internal quotation marks and citations omitted); *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000).

No reasonable person could have believed that Krenjy's comments created such an environment. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create an abusive work environment. *Breeden*, 532 U.S. at 271 (citation omitted). This was a one-off incident caused by Krenjy, who did not have a history of inappropriate behavior. Both Bogan and Oberdorfer were quick to handle the incident. They issued a verbal warning, and Krenjy was apologetic for his comments. The comments were not physically threatening and were made in Kiser's absence. While the comments were unprofessional, they were made in jest; the others at the meeting laughed, characterized it as "shop talk" and did not find the comments "offensive" or even "inappropriate." Witness Statements, R. 36-6 at PageID 656–57. One of the attendees even said that they would have "follow[ed] the proper protocol" in reporting such statements if they felt uncomfortable, which they did not. Witness Supplemental Email, R. 27-1 at PageID 241. Although Kiser was grateful that Schelle stood up for him, Kiser himself wanted the matter to be a "bygone." Bogan Dep., R. 31 at PageID 356. There is no indication that the incident interfered with Kiser's ability to perform his job, and he continued to work with Krenjy even after learning of the incident.

These facts do not lend themselves to the conclusion that Krenjy's comments created an abusive work environment. Far worse conduct has failed to do so. *See, e.g.*, *Morris*, 201 F.3d at 790 (male supervisor made sexual advances on plaintiff during her performance evaluation, made several lewd jokes and isolated comments about her appearance, including calling her "Hot Lips"); *Burnett*, 203 F.3d at 981 (male manager placed a pack of cigarettes inside plaintiff's tank top and bra strap and made several lewd jokes, including telling plaintiff she had "lost [her] cherry"); *Clark*

*v. United Parcel Serv.*, 400 F.3d 341, 351 (6th Cir. 2005) (male supervisor told sexual jokes, twice placed a vibrating pager against plaintiff's thigh, and pulled on her overalls after plaintiff mentioned she was wearing a thong underneath). Accordingly, Schelle did not engage in protected activity and failed to establish a prima facie Title VII retaliation case.

Schelle's counterarguments are unpersuasive. Schelle claims he is entitled to Title VII's protection from retaliation because he "acted to prevent further escalation of the harassment of his coworker." Appellant Br. 13. He argues that employees need not wait to report "an undisputed incident of inappropriate sexual harassment before it [rises] to the level of 'severe or pervasive'" to gain Title VII protections. Appellant Br. 11. In his view, waiting to report only perpetuates harassment and results in the chilling of those who would otherwise report harassment based on their organization's policies. Appellant Br. 12.

But Title VII already takes these considerations into account. The requirement that harassment must be so "severe or pervasive" leading to "an abusive working environment" forges "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). And when properly applied, this standard "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," thereby ensuring workplaces can function effectively without the looming threat of Title VII litigation for everyday disputes. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). In short, Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). And its protections cannot be invoked to police "the conduct of jerks, bullies, and persecutors" during daily workplace skirmishes. *Wasek*, 682 F.3d at 467. But Schelle

asks us to do just that. Although Schelle's act of standing up for a junior employee was admirable, Krenjy's comments were not an "undisputed incident of inappropriate sexual harassment" and no reasonable person could believe they rose to a level that would fall under Title VII's ambit. Appellant Br. 11.

Schelle relies on Fourth Circuit case law to advance his argument that he is entitled to Title VII protections from retaliation for opposing "a hostile work environment that, although not fully formed, is in progress." *Id.* at 12 (citing *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc)). But our decision today aligns with *Boyer-Liberto*. Prior to *Boyer-Liberto*, Fourth Circuit precedent provided that "an isolated incident of harassment [was generally] insufficient to create a hostile work environment" because the plaintiff could not "have possessed a reasonable belief that a Title VII violation was in progress," unless there was evidence "that a plan was in motion to create such an environment" or "that such an environment was [otherwise] likely to occur." *Boyer-Liberto*, 786 F.3d at 282 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 340 (4th Cir. 2006)). The *Boyer-Liberto* court, sitting en banc, did away with this standard because "rather than encourag[ing] the early reporting vital to achieving Title VII's goal of avoiding harm," the standard "deterr[ed] harassment victims from speaking up by depriving them of their statutory entitlement to protection from retaliation." *Id.* at 283. Instead, the Fourth Circuit adopted the standard that we used here today, which requires the court to focus "on the severity of the harassment" when evaluating "the reasonableness of an employee's belief that a hostile environment is occurring based on an isolated incident." *Id.* at 284 (citing *Breeden*, 532 U.S. at 270–71). And, as already explained, Schelle's retaliation claim fails under this standard because a reasonable person could not believe that Krenjy's comments created an abusive working environment.

**B.**

We next proceed to Schelle's state law claims. Schelle argues that the district court erred in granting summary judgment to the defendants on his aiding and abetting claim under Ohio Rev. Code § 4112.02(J). Much like Title VII, Ohio law makes it an "unlawful discriminatory practice" if an employer discriminates against a person because of that person's "race, color, religion, sex, military status, national origin, disability, age, or ancestry[.]" Ohio Rev. Code § 4112.02(A). Ohio law also makes it illegal "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice[.]" *Id.* § 4112.02(I). It is also illegal for "any person to aid, abet, incite, compel, or coerce" an unlawful discriminatory practice described in the statute. *Id.* § 4112.02(J).

Given the similarities between Ohio law and Title VII, Ohio courts have held that "federal law provides the applicable analysis for reviewing retaliation claims" under Ohio Rev. Code § 4112.02(I). *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (cleaned up). Therefore, we analyze a retaliation claim under Ohio law using the same framework as we do for a Title VII retaliation claim. *Id.* And because Schelle failed to establish such a claim under Title VII, we find no violation of Ohio law either. Without a viable retaliation claim, Schelle's claim that Krenjy and Oberdorfer aided and abetted any retaliation under Ohio Rev. Code § 4112.02(J) also fails as matter of law. *Childs v. Kroger Co.*, 222 N.E.3d 741, 782–83 (Ohio Ct. App. Aug. 3, 2023) (collecting cases and holding that a claim for aiding and abetting unlawful discrimination under Ohio Rev. Code § 4112.02(J) fails as a matter of law when the plaintiff fails to establish the underlying discrimination claims).

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's judgment.