NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0546n.06

Case No. 25-1143

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 25, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| TERRA WARGO, | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| MJR PARTRIDGE CREEK DIGITAL CINEMA 14, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |

Before: GRIFFIN, THAPAR, and HERMANDORFER, Circuit Judges.

THAPAR, Circuit Judge. Terra Wargo claims that her manager at a movie theater sexually harassed her. She also believes the theater fired her because of her complaints about that alleged harassment. So she sued the theater for sexual harassment, sex discrimination, and retaliation. But since Wargo can't show that the theater violated either federal or Michigan law, we affirm the district court's grant of summary judgment.

I.

In 2015, Terra Wargo began working at MJR Partridge Creek Digital Cinema 14 (Partridge Creek). She started off selling candy and popcorn at the concessions stand and showing moviegoers to their seats. But she quickly rose through the ranks, eventually becoming a full-time manager. Another door soon opened when the general manager at Partridge Creek resigned. So Wargo applied and interviewed for that open position. But she didn't get the job. Instead, MJR

Group LLC (MJR)—Partridge Creek's managing company—transferred Paul Finnigan from another one of its theaters to take over as general manager. Joel Kincaid, MJR's vice president of operations, offered Wargo the general manager position at a different MJR theater—Finnigan's old job. Wargo declined that promotion, preferring to stay at Partridge Creek.

Although she stayed, Wargo didn't enjoy working with Finnigan. Only a few weeks into Finnigan's time at Partridge Creek, Wargo felt that he didn't treat people well and had issues communicating. When Finnigan emailed managers to let them know he would be changing their schedules, Wargo told a coworker she would "consider transferring." R. 39-2, Pg. ID 282. She later texted the same coworker that if Finnigan's efforts at Partridge Creek were poor, Wargo would confront him and talk to his supervisor, Kincaid. *Id.* at 283. That same coworker told Wargo that she'd heard Finnigan insinuate that Wargo would be "trouble." *Id.* at 272.

During this time, Finnigan had also been texting Wargo at her personal phone number. He texted Wargo that he had gone to a restaurant and that she was "welcome to join." R. 39-6, Pg. ID 445. Wargo declined that offer. Then Finnigan told her that he planned to teach her about "break[ing] down concessions sales" the next week. *Id.* After mentioning how much he knew about the ordering system, Finnigan made comments such as:

- "I will teach you all I know."

- "I can show you everything . . . [i]f you let me."

- "I will teach you everything."

- "You just have to trust me, and my methods."

- "You will learn more than you think."

*Id.* at 445–48. The next month, Finnigan asked Wargo during work hours whether she wanted to "get something to eat." *Id.* at 449. Wargo declined. After more conversation, Finnigan thanked Wargo for her help with something at work, adding, "I wanted to treat you to dinner[.]" *Id.* at 454.

A month later, Finnigan passed Wargo while they were both driving near the theater. He gave her a "confused look" and raised his hands, turned his car around, and "followed" Wargo into a parking lot near Partridge Creek. R. 39-8, Pg. ID 458. He then texted her, noting that she was "back at [P]artridge [C]reek" and asking, "Do you secretly just live here :)[?]" R. 39-6, Pg. ID 455. Wargo didn't respond.

On July 13, 2021, Finnigan again asked Wargo if she wanted to meet at a restaurant or at the theater later. He later testified that he was trying to "mitigate the issues" between him and Wargo. R. 43-1, Pg. ID 527. Wargo said she wasn't going to leave the theater, so Finnigan met her there.

The meeting didn't go well. On Wargo's telling, Finnigan "became angry and aggressive" and asked Wargo why she didn't like him and what he did wrong. R. 39-11, Pg. ID 463. Wargo told Finnigan that she and others had problems with his lack of "respect and communication." R. 39-2, Pg. ID 273. The two argued, and Finnigan "slammed a piece of paper down." *Id.* So Wargo left, and Finnigan followed her to an office next door, where they continued arguing. Wargo tried to leave multiple times, but Finnigan blocked the door. She alleges that Finnigan "touched [her] arm" for about "5 to 10 seconds" to stop her from leaving. *Id.* at 272. Eventually, he moved out of the way, and Wargo headed to her car outside the building.

Wargo filed an internal complaint against Finnigan after this incident. She asked for Finnigan's removal from the company because of his "inappropriate behavior." R. 39-11, Pg. ID

463.[1] Kincaid investigated the complaint. The investigation found that both Wargo and Finnigan acted inappropriately, but there was no sexual harassment. So MJR issued them both written warnings.

MJR required Wargo and Finnigan to review the company's sexual-harassment and bullying policies and placed Finnigan on a "Performance Improvement Plan" (PIP) for ninety days. R. 39-14, Pg. ID 466–68. Wargo's warning directed her to bring any future complaints from other employees directly to human resources (HR) and not to discuss them with her coworkers. MJR also gave Wargo the option to transfer to a different MJR theater less than ten miles away. Wargo accepted that offer. While her area of responsibility changed, she remained a manager with the same pay and benefits.

But later, Wargo returned to Partridge Creek. Although she had no more work responsibilities there, she met with her former coworkers in a keyed office at the theater one night for around three hours. One of those coworkers quit from the theater the next day and filed a sexual-harassment complaint against Finnigan. Finnigan heard about the complaint and filed his own complaint asking to be transferred from Partridge Creek because of the "all[e]gations and attempts to remove" him. R. 39-16, Pg. ID 471. He later resigned.

About two weeks after Wargo's meeting with her former coworkers, MJR fired her. It gave three reasons for that decision: (1) inappropriate comments about a manager, (2) insubordination to and a verbal outburst at a manager, and (3) a refusal to "follow company policy and directive provided in corrective/disciplinary action." R. 39-18, Pg. ID 475. Kincaid later explained that Wargo had violated unwritten company policy by entering a keyed office at

---

[1] The record contains a second document with portions of Wargo's and Finnigan's internal complaints. Wargo believes that someone at MJR altered the document. Viewing these facts in the light most favorable to Wargo, we rely on the version she refers to as "correct." Appellant's Br. at 10. The district court did the same.

Partridge Creek when she no longer worked at that location. And Wargo discussed HR-related issues with her coworkers despite the earlier written warning not to do so. In sum, Kincaid and MJR "lost faith that [Wargo] was trustworthy" and therefore fired her. R. 39-3, Pg. ID 331.

So Wargo sued Partridge Creek. She brought claims for sexual harassment and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA). And she alleged that Partridge Creek retaliated against her in violation of those same laws. Partridge Creek moved for summary judgment against Wargo on all claims, and the district court granted that motion. After the district court denied reconsideration, Wargo timely appealed.

## II.

We review the district court's grant of summary judgment de novo, and we construe the facts in the light most favorable to Wargo. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023). We may "affirm on any ground supported by the record and raised below." *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). A party may prevail on a motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, Partridge Creek is entitled to summary judgment because Wargo's claims fail as a matter of law.

## A.

Start with Wargo's claims of hostile-work-environment sexual harassment. We analyze such Title VII claims under both a subjective and objective standard. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To satisfy the subjective component, Wargo must personally regard the environment as abusive. *Id.* at 21–22. Under the objective prong, Wargo must show that the challenged conduct was "severe or pervasive enough" to create a working environment that a

reasonable person would find hostile or abusive. *Id.* Several factors govern whether conduct clears this "high bar," such as the conduct's frequency, severity, threatening or humiliating nature, and interference with the employee's work. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485–86 (6th Cir. 2020). And words with "sexual content or connotations" can't create a hostile workplace environment on their own. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). These standards apply to both Wargo's Title VII claim and her ELCRA claims.[2] *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

The district court correctly found that Wargo can't meet the "high bar" required to satisfy the objective test. Wargo points to Finnigan's repeated invitations to join him at a restaurant—three times in a three-month period. But those invitations were sporadic, and none involved explicit pressure or sexual conduct. Wargo points to texts from Finnigan like "I will teach you all I know" and "[y]ou just have to trust me, and my methods" as evidence of sexual undertones. R. 39-6, Pg. ID 445–48. Yet those texts all came immediately after a routine work discussion where Finnigan offered to "show [Wargo] how to break down concessions sales." *Id.* at 445. And Finnigan's purported comment to another employee that Wargo would be "trouble" wasn't sexual in nature either. R. 39-2, Pg. ID 272. In fact, Wargo testified that she thought it just meant she would be a "problem to [Finnigan] moving forward." *Id.* Even if we considered all Finnigan's communications sexual in nature and combined them with the incident where he followed Wargo

---

[2] ELCRA opens one avenue that Title VII blocks. It allows sexual-harassment claims based on "quid pro quo harassment." *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000). To prove quid pro quo harassment, Wargo would have to show that MJR used her response to unwelcome sexual conduct as a factor in a decision affecting her employment. *Id.* But Wargo has forfeited this argument. Both before the district court and in her appellate briefing, Wargo never discussed the quid pro quo theory of harassment. Instead, she claimed a hostile workplace environment, discrimination, and retaliation. Those arguments don't allege a quid pro quo claim under ELCRA. So any such claim is forfeited. *See Bose v. Bea*, 947 F.3d 983, 992 (6th Cir. 2020).

to the Partridge Creek parking lot, his actions weren't "severe or pervasive." *Harris*, 510 U.S. at 21. So a reasonable person wouldn't have found the workplace "hostile or abusive." *Id.*

The July 13 argument between Finnigan and Wargo also didn't establish a hostile workplace environment. While Finnigan may have been angry and aggressive, his actions weren't sexual. After all, Wargo admits they argued about work problems. Instead, she claims Finnigan's blocking the door and making physical contact with her arm for five to ten seconds prove harassment. But this one-time contact wasn't sexual or sufficiently pervasive. In fact, this conduct pales in comparison to other cases where more invasive, aggressive, and sexual conduct still fell short of the "high bar" for a hostile workplace environment. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 345, 352 (6th Cir. 2005); *Hensman v. City of Riverview*, 316 F. App'x 412, 416 (6th Cir. 2009). In sum, Finnigan's one-time contact with Wargo's arm, even combined with all her other allegations, is simply not enough to establish liability for a hostile work environment based on sexual harassment.

At the end of the day, Wargo asks us to impose liability by simply accepting her subjective interpretation of Finnigan's words and actions. But that's not the law. Instead, we also look to how a reasonable person would've interpreted Finnigan's actions. And a reasonable person wouldn't have found his conduct sufficiently abusive. So Wargo's sexual-harassment claim fails as a matter of law.

B.

Wargo's claims of sex discrimination also miss the mark. She can attempt to establish sex discrimination through either direct or indirect evidence. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Under both Title VII and ELCRA, direct evidence must "require[] the conclusion" that MJR took an adverse employment action against Wargo at least in part because

she is a woman. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Wargo provides no direct evidence of discrimination. She suggests that both MJR's selection of Finnigan over her as general manager of Partridge Creek and her eventual firing indicate discrimination. But she identifies no statements, documents, or actions that "require[] the conclusion" MJR took those actions because of her sex. *Id.* MJR decisionmakers didn't say anything about Wargo's sex at all, let alone in relation to her potential promotion or firing.

Nor does Wargo provide indirect evidence of sex discrimination. The three-step *McDonnell Douglas* framework applies to Title VII and ELCRA sex-discrimination claims based on indirect evidence. *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 857 (6th Cir. 2025) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *Hazle*, 628 N.W.2d at 521–22. Wargo must first show a prima facie case of discrimination. *Hayes*, 144 F.4th at 857. If she succeeds, MJR can rebut that case with a legitimate reason for its adverse employment actions. *Id.* And if MJR offers such an explanation, Wargo must then show that a reasonable jury could reject that explanation as pretextual. *Id.*

Wargo fails at the first step—she can't establish a prima facie case of discrimination. To establish a prima facie case, Wargo must show that (1) she is a woman, (2) she suffered an adverse employment action, (3) she was qualified for her job, and (4) MJR replaced her with a male employee or treated her less favorably than a similarly situated male employee. *Id.* at 858. No one contests that Wargo is a woman or was qualified for her job, so we focus on the second and fourth elements.

Wargo seems to allege three different potential adverse employment actions: (1) MJR's hiring of Finnigan instead of her as the Partridge Creek general manager, (2) her transfer to a

different theater, and (3) her termination. But Wargo's transfer wasn't an adverse employment action. And for the other two actions, Wargo can't show that MJR treated her less favorably than a comparable male employee.

First, Wargo's transfer didn't constitute an adverse employment action. As Wargo agreed, her transfer to another MJR theater after her argument with Finnigan was lateral. Her pay and benefits didn't change. She just managed a different department. A lateral transfer like this can sometimes constitute an adverse employment action, but only if the transferee suffers "some injury respecting her employment terms or conditions." *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024). In short, Wargo must show that the transfer "left her worse off." *Id.* She hasn't. Wargo didn't testify to any harm from the transfer, and she instead mentioned that she got along well with her new manager. Without any alleged harm, Wargo can't show that her transfer was an adverse employment action.

In contrast, Wargo's lack of promotion to general manager and termination both qualify as adverse employment actions. However, neither can support her claim because she can't identify a similarly situated male comparator. True, MJR chose Finnigan over Wargo for the Partridge Creek general manager position. But Wargo and Finnigan weren't "similarly situated in all relevant aspects of their . . . jobs." *Hayes*, 144 F.4th at 861. Finnigan had worked as a general manager before, while Wargo hadn't. Indeed, Finnigan had even helped open the Partridge Creek location. So the two weren't at all "similarly situated" for the purpose of promotion. *Id.*

The same goes for Wargo's termination. Wargo again can't point to a similarly situated male employee whom MJR treated better. For Wargo to identify a comparator, the male employee must have "engaged in the same conduct" as Wargo. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Yet no male employee engaged in the same conduct that led to Wargo's firing.

MJR fired Wargo for making "[i]nappropriate comments" about a supervisor and failing to follow a directive from a disciplinary warning. R. 39-18, Pg. ID 475. And while Wargo points to Finnigan as a comparator, he didn't do either of those things. So he can't be "similarly situated." *Hayes*, 144 F.4th at 858. Without any comparators, Wargo's sex-discrimination claim can't get off the ground.

C.

Wargo lastly claims that MJR fired her in retaliation for reporting Finnigan's alleged sexual harassment and helping a coworker file a sexual-harassment complaint against Finnigan. Both Title VII and ELCRA ban employers from retaliating against their employees for engaging in protected activity. 42 U.S.C. § 2000e-3(a); Mich. Comp. Laws § 37.2701(a). Protected activity includes (1) participating in a formal charge or investigation under Title VII or ELCRA or (2) opposing a violation of Title VII or ELCRA. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 347–48 & n.3 (6th Cir. 2021). And Wargo can establish retaliation with either direct or indirect evidence that her protected activity caused her termination. *Id.* at 344. But Wargo hasn't done so.

First, Wargo couldn't have participated in a formal charge or investigation for a violation of Title VII or ELCRA. That's because no formal investigation had begun before her firing. Wargo didn't file a formal charge of a Title VII violation with the Equal Employment Opportunity Commission until months after her termination. And her coworker filed only an internal complaint against Finnigan. That complaint isn't in the record, and Wargo never claims that it alleged a violation of federal or state law. So Wargo hasn't established that she "participated" in any protected charge or investigation for the purposes of Title VII or ELCRA. *Id.* at 343; *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003).

That leaves opposition to a Title VII or ELCRA violation. Wargo first claims there's direct evidence that she faced retaliation for opposing sexual harassment. She believes MJR admitted it fired her for failing to follow a "directive" not to discuss complaints about other employees with her coworkers. R. 39-18, Pg. ID 475. According to Wargo, because such discussions are protected activities, MJR conceded it retaliated against her.

But there's a problem: Wargo forfeited this theory by not raising it to the district court. Wargo didn't mention this claim in her complaint, even though MJR had sent her the reasons for her dismissal. Nor did she raise this claim in her opposition to summary judgment. By failing to raise this theory before summary judgment, Wargo has forfeited her right to bring it up now on appeal.[3] *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 589–90 (6th Cir. 2002).

Without direct evidence, Wargo must turn to indirect evidence. So she must put forward a prima facie case of retaliation. *Jackson*, 999 F.3d at 343–44. That case requires four elements: (1) Wargo engaged in protected activity, (2) MJR knew about that activity, (3) MJR took materially adverse action against Wargo, and (4) Wargo's protected activity is causally connected to that materially adverse action. *Id.*

But Wargo hasn't established the fourth prong: causation. That's because she didn't respond to MJR's argument before the district court that any protected activity didn't cause an adverse employment action. Wargo offered only a single paragraph on retaliation that took up less than a page. That paragraph simply listed Wargo's communications to MJR management and then

---

[3] Wargo did bring up this purported direct evidence in a motion for reconsideration *after* summary judgment. But, as the district court correctly noted in denying that motion, she was too late. R. 53, Pg. ID 891–92 (citing *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 841 (6th Cir. 2018)). And while Wargo's statement of the issues contests the denial of her motion for reconsideration, she doesn't "present[] any argument on this subject in [her] briefs." *Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003). So it is forfeited. *See id.*

referenced the rest of her arguments for sex discrimination and sexual harassment. Wargo concluded, "Plaintiff was retaliated against as shown by the arguments in the preceding section of her response." R. 42, Pg. ID 512. But the "preceding section" never once mentioned retaliation, let alone the issue of causation. Because Wargo made this argument in a "perfunctory manner" without an "effort at developed argumentation," she forfeited the issue of causation. *Cockrun v. Berrien County*, 101 F.4th 416, 419 (6th Cir. 2024) (cleaned up). And without the required fourth prong of her prima facie case, Wargo's retaliation claim fails.

\* \* \*

We affirm.